UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALI NESSAR,<br><br>    Plaintiff,<br><br>        v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | Civil Action No. 12-627 (JEB) |

**MEMORANDUM OPINION**

For almost twenty years, Plaintiff Ali Nessar was employed as a correctional officer with the District of Columbia Department of Corrections. In October 2008, however, he claims that he was forced to resign as a result of discrimination based on his race, religion, and national origin. Having filed an administrative complaint and having been issued a right-to-sue letter, Plaintiff filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging disparate treatment (Count I), hostile work environment (Count II), and retaliation (Count III). The District now moves for summary judgment, challenging both the timeliness of the suit and its merits. Because the Court finds that the non-promotion claims in Count I are untimely and that Plaintiff has failed to raise a genuine issue of material fact as to any of his remaining claims, it will grant Defendant's Motion.

**I.**     **Background**

For the most part, the evidence in this case is undisputed. As Nessar is the nonmoving party, the Court will, in discussing the state of the record, credit his evidence and draw justifiable inferences in his favor.

1

Plaintiff began his lengthy career as a correctional officer in the District of Columbia when he was hired by the Department of Corrections in March of 1988. See Opp., Exh. 1 (10/25/12 Deposition of Ali Nessar (Nessar Dep. I)) at 15:7-17. Over the next ten years, Nessar passed numerous tests and was promoted to Corporal, Sergeant, and ultimately Lieutenant. See id. at 17:6-18:12. In 2001, however, he was released from his position in what the District claimed was a reduction in force. See id. at 25:11-19. Nessar was the only employee with the rank of Lieutenant who was released during the reduction, and other employees with similar rank who had been at the Department for less time remained. Nessar filed a lawsuit in this District in 2003 stemming from the discharge, which was later dismissed for want of prosecution. See id. at 26:1-13; Opp., Exh. 3 (11/30/12 Deposition of Ali Nessar (Nessar Dep. II)) at 6:5-9; Opp., Exh. 2 (Pl.'s Response to Interrogatories), ¶ 9. Plaintiff was re-hired by the District in 2003 and remained at the rank of Lieutenant until he resigned in 2008. See Nessar Dep. I at 34:3-6, 18:15-19:14; Nessar Dep. II at 6:11-12.

During both periods of employment with the District, Nessar claims that he was subjected to discrimination on the basis of his race (non-black), religion (Muslim), and national origin (Afghani). See Nessar Dep. II at 5:1-9, 6:13-17. This discrimination, he contends, grew worse following the terrorist attacks of September 11, 2001. See Nessar Dep. I at 79:11-22. From 2003 to 2008, Nessar contends he was passed over for numerous promotions that ultimately went to less-qualified employees who were black, Christian, and native-born. See Nessar Dep. II at 10:4-12:17. The specifics of what these promotions were and when they were available will be discussed in greater detail below. See Section III.A.1, *infra*.

In addition to being passed over for promotions, Nessar maintains that:
- Supervisors "would attempt to find false reasons to reprimand [Nessar] and [he] was verbally abused with

2

> threats to terminate [his] employment," see Pl.'s Resp. to Interrogs. at 6;
>
> - He was "made to feel very uncomfortable and unwanted," see id.;
>
> - He "was assigned to more difficult zones (special handling units), which [he] often had to work alone to supervise . . . while other people in the same positions would often receive additional help," see id.;
>
> - He was "ignored" and "treat[ed] . . . badly," see id. at 7; and
>
> - He was "talked to by others, even if the actual words were not threats or harassment, the tone conveyed something discriminatory."

See id. at 8.

Two events in October 2008 punctuate the ongoing abuses Nessar experienced. First, while speaking to his superior (and friend) Captain Murray Jones, Nessar complained that the Department "give[s] their own relatives and friends in the same race and culture and color and nationality [promotions]. I don't think I don't have no future in this department." See Nessar Dep. II at 50:15-18; see also id. at 34:14-17. Several minutes later, Jones passed along this comment to Captain Nora Talley, and "both of them laughed." See id. at 51:2. Nessar understood their laughter as an acknowledgment by his superiors that he had no future there. See id. at 51:1-3. Second, later that month Nessar's supervisors threatened to fire him for refusing to sign an incident report related to an issue with an inmate. See Nessar Dep. I at 28:10-32:15; Nessar Dep. II at 25:10-27:13. According to Nessar, his supervisors concocted this dispute as part of a plan to oust him from the Department. See id. As a result of these incidents, Nessar tendered his resignation, effective October 29, 2008. See Opp., Exh. 5 (Resignation Letter).

On April 24, 2009, Nessar filed a charge of discrimination with the D.C. Office of Human Rights, which was cross-filed with the Equal Employment Opportunity Commission. See Opp., Exh. 4 (Charge of Discrimination). The Charge alleged that he had "been subjected to a disparate treatment and retaliated against on the bases of race (Asian), religion (Muslim) and national origin ('Persian')" from June 30 through November 29, 2008. See id. at 1. He received a right-to-sue letter on January 24, 2012, and subsequently filed this suit on April 20. See Opp., Exh. 6 (Right-to-Sue Letter).

**II.    Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006);

4

Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

**III. Analysis**

In moving for summary judgment, the District of Columbia contends that all three of Plaintiff's counts are infirm. The Court agrees.

A. Count I: Disparate Treatment

Plaintiff's disparate-treatment claim rests on two distinct types of discrimination: being passed over for promotions and being constructively discharged. See Compl, ¶¶ 22-26. Because the facts and defenses relevant to each are unrelated, the Court will discuss them separately.

*1. Failure to Promote*

Plaintiff contends that "[d]uring his 20 year tenure" with the District, he was discriminated against because Defendant failed to promote him, instead promoting "others with lesser qualifications and less seniority that were not members of his protected group." See id., ¶

7. Any analysis of Plaintiff's failure-to-promote claims must be divided temporally between acts before June 9, 2008, and acts after.

        a. Promotions before June 9, 2008

Defendant first maintains that any claims stemming from promotions that occurred before June 9, 2008, are time barred because they involve discrete acts outside of the 300-day window from the date Plaintiff filed his charge of discrimination (April 24, 2009). See Mot. at 6-7 (citing 42 U.S.C. § 2000e-5(e)(1)); Reply at ECF pp. 1-4. Plaintiff concedes that such claims would be untimely under U.S.C. § 2000e-5(e)(1), but contends that the timeliness issue can be cured through application of the continuing-violations doctrine. See Opp. at 8.

This doctrine, however, does not apply in a failure-to-promote case. The Supreme Court made clear in Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), that courts should not treat individual incidents of alleged discrimination as part of a discriminatory pattern for exhaustion purposes: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" Id. at 114 (emphasis added). Unlike hostile work environments, for example, which may involve continuing violations, failure to promote does not trigger this doctrine. See Nguyen v. Mabus, 895 F. Supp. 2d 158, 172-73 (D.D.C. 2012) (rejecting application of continuing-violation theory in failure-to-promote context). Plaintiff's failure-to-promote claims for positions pre-dating June 9, 2008, are thus time barred.

        b. Promotions after June 9, 2008

Turning next to the later claims, the Court must first determine whether any promotions were actually available after June 9. See Yarber-Butler v. Billington, 53 Fed. Appx. 120, 120 (D.C. Cir. 2002) (*per curiam*) (a failure-to-promote claim will fail "if there is no open position"

to be had); see also 45B Am. Jur. 2d Job Discrim. § 788 (2013) ("In order to prove discrimination in the making of a promotion decision, there must have been a position open."). Having scoured the record, the Court can find no evidence that the District promoted anyone from Lieutenant to Captain during this period.

In support of his contention that Defendant promoted numerous, less-qualified individuals over him, Plaintiff directs the Court to his deposition testimony. See Opp. at 10. None of the promotions he points to, however, occurred between June 9, 2008, and Plaintiff's resignation that October. See Nessar Dep. I at 64:22-65:1 (Harper promoted from Captain to Major in 2003), 48:5-49:21 (Nelson promoted to Captain in 2007); 51:20-52:18 (McDonald Haynes promoted to Captain in 2007), 54:10-55:3 (Bishop promoted to Captain in 2007), 59:7-60:10 (Gray promoted to Captain in 2007), 60:18-61:19 (Talley promoted to Captain before 2007), 65:5-15 (Watford promoted to Captain in 2007), and 73:5-10 (Kolley promoted to Captain in 2003).

Plaintiff had an opportunity through discovery to develop factual support for the allegations in his Complaint, yet he has failed to do so. With no evidence that any positions were filled in the June - October 2008 time-frame, no genuine issue of material fact remains to justify a denial of summary judgment with respect to the failure-to-promote claims.

    *2. Constructive Discharge*

Plaintiff also alleges a constructive-discharge claim in Count I. See Compl., ¶ 18 ("After being subjected to the consistent discrimination, hostile work environment, retaliation and disparate treatment, Plaintiff realized that after he was told he had no future there, that he had no choice but to tender his resignation on October 28, 2008, knowing that he could not be moved up in the ranks, advance his career, or make more money if he stayed.").

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pa. State Police v. Suders, 542 U.S. 129, 141 (2004) (citation omitted); see also Aliotta v. Bair, 614 F.3d 556, 566 (D.C. Cir. 2010) ("The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances."). A finding of intentional discrimination, furthermore, is a necessary predicate for a Title VII claim based on constructive discharge. Bishopp v. Dist. of Columbia, 788 F.2d 781, 790 (D.C. Cir. 1986); see also Peters v. Dist. of Columbia, 873 F. Supp. 2d 158, 199 (D.D.C. 2012) (discussing necessary causal connection between employees' resignations and employer's discriminatory acts).

While the allegations in the Complaint attempt to lump together all acts of discrimination as a basis for the constructive discharge, the Court will focus its inquiry here on the two events of October 2008, as Plaintiff unequivocally testified that he resigned as a result of those incidents. See Nessar Dep. I at 37:14-18. The first involves conduct that was not so intolerable that a reasonable person would have felt compelled to resign. The second could support a constructive-discharge claim, yet it also fails as it involves no discriminatory animus.

First, as related earlier, while speaking to his friend and superior Captain Jones, Nessar complained that the Department "give[s] their own relatives and friends in the same race and culture and color and nationality [promotions]. I don't think I don't have no future in this department." See Nessar Dep. II at 50:15-18; see also id. at 34:14-17. Several minutes later, Jones mentioned this comment to Captain Talley, and "both of them laughed." See id. at 51:2.

8

Nessar believed their laughter demonstrated he was unlikely to be promoted at the Department of Corrections. See id. at 51:1-3. A constructive-discharge claim cannot be based on evidence as flimsy as the mere laughter of superiors in a seemingly friendly conversation. See, e.g., Quarless v. Bronx Lebanon Hosp. Ctr., 75 Fed. Appx. 846, 848 (2d Cir. 2003) (complaints of mistreatment by colleagues insufficient to support constructive-discharge claim); Sanchez v. Gen. Growth Mgmt. Co., No. 96-21070, 1998 WL 44520, at *2 (5th Cir. Jan. 23, 1998) (unpublished) ("considerable unpleasantness" between plaintiff and employer, including being "verbally attacked, belittled and 'nick-pick[ed]'" could not support constructive-discharge claim).

The second incident occurred shortly after this and involved a dispute Nessar had with his superiors regarding his refusal to sign paperwork related to an incident with an inmate. See Nessar Dep. I at 36:14-37:18. Nessar refused to sign the forms because he felt that his superiors were "trying to find one way or the other to get rid of [him]." Nessar Dep. II at 26:12-20. Major Harper told Nessar that "if he [refused to sign] it next time," he'd be written up and be fired. See Nessar Dep. I at 37:4-13 ("Major Harper . . . said next time write Lieutenant Nessar [up], I'm firing him and taking money out of [his] pocket.").

While a threatened termination may theoretically support a wrongful-discharge claim, see, e.g., Williams v. Johnson, 870 F. Supp. 2d 158, 166 (D.D.C. 2012), there is no evidence here of any discriminatory bias on the part of Major Harper, who was not a party to the earlier discussion with Jones and Talley. Instead, Harper's threat to fire Nessar was made in response to his refusal to comply with a directive from his superior. See Nessar Dep. I at 37:4-13. While Nessar attempts to link the threat to his complaints about being passed over for promotions –

9

speculating that this was part of a bigger scheme to oust him – there is no evidence connecting the two.

Because Plaintiff has failed to provide any evidence to suggest that Harper's threat of termination was discriminatory – *i.e.*, that it was based on his race, religion, or national origin – Defendant is entitled to judgment on this part of Count I as well.

B. Count II: Hostile Work Environment

In Count II, Plaintiff alleges that he was subjected to a hostile work environment in which he was "constantly harassed with reprimands based on false allegations," "constantly threatened to be terminated," and "told he had no future with Defendant . . . [and] would never be promoted." See Compl., ¶¶ 28-31. Defendant contends that there is no evidence that the complained-of conduct was sufficiently egregious to support his claim. See Reply at 8; see also Mot. at 11-12. The Court agrees and will grant Defendant's Motion on this count.

To prevail on a hostile-work-environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 (1993)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).

"The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" George v. Leavitt, 407 F.3d 405, 416

(D.C. Cir. 2005) (quoting Faragher, 524 U.S. at 788). By adhering to these standards, the Court thereby "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted). Although it did not apply to the failure-to-promote claim, the continuing-violation doctrine does permit the Court to look at conduct that took place outside of the statute of limitations period for the hostile-work environment claim. See Keohane v. United States, 669 F.3d 325, 329 (D.C. Cir. 2012); see also Earle v. Dist. of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012).

Plaintiff bases his hostile-work-environment count on the following purported evidence:

- "[He] was continuously assigned to very difficult and dangerous work zones without backup, while other Lieutenants received much easier assignments," see Opp. at 20 (no citation to record);

- "[H]e was verbally abused with threats to be reprimanded and terminated, and he was treated differently than others in the way he was talked to and reacted to," see id. (citing Exh. 2 (Pl.'s Response to Def.'s Interrogatories), ¶¶ 5-8, 14);

- "He was made to feel very uncomfortable and unwanted and was in the environment where he didn't feel safe physically or emotionally, often being ignored. It was clear by the way people looked at him, talked to him, and reacted to him that he was being treated differently," see id. (citing Pl.'s Response to Def.'s Interrogatories, ¶¶ 5-8, 14);

- "[He] was continuously denied any opportunity for a promotion, while others were promoted. Furthermore, Plaintiff was yelled at, laughed at, and humiliated," id. (citing Nessar Dep. I at 31:7-22; Nessar Dep. II at 32:7-11, 50:14-51:3);

- "[He] started realizing that his superiors were trying to set him up to fire him," id. (citing Nessar Dep. II at 26:12-27:13, 53:7-54:6); and

- "[His] working conditions became so intolerable that he was forced to resign."

11

Id. at 20-21 (citing Nessar Dep. II at 37:20-38:15, 40:4-9).

The Court need not decide whether such cumulative evidence could ever substantiate a hostile-work-environment claim, however, because the record simply does not support Plaintiff's characterization of the facts. For instance, there is no evidence that Nessar was assigned to "difficult and dangerous work zones." See Opp. at 20 (no citation to record). Although Nessar describes in detail his frustrations with his assignment to a specific unit – and his feeling that his requests for backup at times would be ignored – the difficulties he describes are consistent with the challenges any correctional officer faces in handling inmates. See Nessar Dep. I at 41:16-46:1, 81:10-82:18; see also Nessar Dep. II at 23:13-25:5 (acknowledging that assignment to specific complained-of unit was part of normal shift change); Pl.'s Response to Def.'s Interrogatories, ¶¶ 5, 7, 8, 11.

Similarly, while he contends he was "yelled at, laughed at, and humiliated," see Opp. at 20 (citing Nessar Dep. I at 31:7-22; Nessar Dep. II at 32:7-11, 50:14-51:3), the record does not include facts that support these allegations either. See, e.g., Nessar Dep. II at 32:7-11 (describing incident of humiliation involving a comment that Plaintiff was "'looking for an easy job. He hiring detail.'"). Conclusory allegations that conditions "became so intolerable that he was forced to resign" are also insufficient to defeat summary judgment, as Plaintiff must substantiate such allegations with actual facts. See Savage v. Scales, 310 F. Supp. 2d 122, 132 (D.D.C. 2004) (discussing Fed. R. Civ. P. 56(e) and its requirement that party opposing summary judgment set forth specific facts and not rely on "the bald allegations contained in its complaint") (internal citations omitted); see also Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008) ("[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show

what evidence it has that would convince a trier of fact to accept its version of the events.") (internal quotation marks omitted).

The record here simply does not support Plaintiff's contentions that he was subjected to conduct "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Harris, 510 U.S. at 21 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)) (internal quotation marks omitted). The indignities that are present in the record here come nowhere close to this standard. See, e.g., George v. Leavitt, 407 F.3d 405, 408, 416-17 (D.C. Cir. 2005) (statements by three employees over a six-month period that plaintiff should "go back where she came from," separate acts of yelling, and hostility did not rise to the level of severity necessary to find a hostile work environment); Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff was placed on administrative leave due to a false accusation, his accent was criticized, he was told he was easy to replace with an American, and he was told that his supervisor would not hire other Africans); Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (employer's treatment of employee did not amount to hostile work environment where employee was humiliated during meetings, screamed at and told to "shut up and sit down," and treated in manner that was "constantly hostile and hypercritical"); Bryant v. Brownlee, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (no hostile work environment where co-worker referred to plaintiff as "nigger" and another co-worker said "black women were at the bottom. The white men were first, the white women were right up there with them."). The Court will thus grant Defendant's Motion as to Count II.

C. Count III: Retaliation

Plaintiff last alleges that he was retaliated against for complaining to his supervisors about discriminatory promotions practices. See Compl., ¶¶ 28-38; see also Opp. at 17-19. Defendant maintains that this count is deficient because "plaintiff cannot meet his burden in establishing that any claimed protected activity was the but-for cause of his alleged adverse action." Reply at 6. The Court believes Plaintiff cannot prevail here either, but for different reasons.

Title VII makes it illegal for an employer to discriminate against an employee because the employee "opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To bring such a claim, Plaintiff must allege that he engaged in a statutorily protected activity, that his employer took an adverse personnel action against him, and that a causal connection exists between the two. Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).

Plaintiff here contends that he was

> retaliated against for pointing out that he was being discriminated against in the promotions process and being treated differently than others. This happened most prominently in Mid-October, which was met with laughter and ridicule. Nessar Dep. II at 50:19-51:3. A few minutes after Plaintiff complained, Captain Jones conveyed Plaintiff's concern that he had no future at the Department to Captain Talley, and they both laughed right in front of the Plaintiff. Id. At that point, Plaintiff went so far as to threaten to expose the Department of Corrections for their discriminatory practices.

Opp. at 18 (citing Exh. 4 (Letter of Determination) at 6). Such an argument satisfies neither of the first two prongs of the retaliation test.

As to the first, the record seems clear that Nessar's statements were not an actual complaint, but rather a friendly, if perhaps somewhat edged, exchange with a colleague. Indeed, in Nessar's deposition, he repeatedly denied making any complaints to his superiors. See Nessar Dep. I at 32:7-8 ("I didn't talk to anybody because I couldn't bring [being discriminated against in the promotions process] up"), 32:18 (responding that he never discussed his future with his superiors).

Even if this were protected activity, his claim would nonetheless fail because he suffered no adverse action. As the Court found in Section III.A.2, *supra*, Plaintiff was not constructively discharged, nor has he contended that any other adverse action was taken against him. Indeed, this Court has previously explained:

> It is not enough for Plaintiff to simply testify that he was retaliated against. In this Circuit, "'there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case . . . that could withstand a summary judgment motion.'" Desmond v. Mukasey, 530 F.3d 944, 964 (D.C. Cir. 2008) (quoting George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005)). That said, "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999). The problem for Plaintiff, then, is not that he is the one asserting that it is "obvious" he was retaliated against, but that "[a]bsent supporting facts – and [he has] provided none – a jury would be in no position to assess [his] claim" that the Agency had in fact retaliated against him. Id. "Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." Id.; see also Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993) (discrimination plaintiff asserting superior qualifications "must support his allegations . . . with facts in the record; a mere unsubstantiated allegation of superior qualifications creates no genuine issue of fact and will not withstand summary judgment").

Alford v. Def. Intelligence Agency, 908 F. Supp. 2d 164, 173-174 (D.D.C. 2012).

Because there is no evidence that Plaintiff either engaged in protected activity or suffered an adverse action, the Court will grant Defendant's Motion on this Count.

## IV. Conclusion

For the aforementioned reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: August 27, 2013